[No. 18601.   Department One.   June 3, 1924.]

UHL BROTHERS, INCORPORATED, *Appellant,* v. ALONZO
HULL *et al., Respondents.*[1]

LANDLORD AND TENANT (75, 79)—NATURE OF DUTY—DEFECTIVE
WATER PIPES—DAMAGE TO TENANT—NOTICE OF DEFECT—NEGLIGENCE.
The owner of premises parts of which are leased to various tenants
is not an insurer of his tenant in one part for damages from a de-
fect in water pipes in another part not under the control of the
injured tenant, where he had no notice of the defect and the same
could not be discovered.

SAME (76)—MUTUAL DUTIES OF TENANTS—SUBTENANTS. A sub-
tenant has no greater rights against the owner than has his imme-
diate landlord, the sub-lessor.

Appeal from a judgment of the superior court for
King county, Lindsley, J., entered November 24, 1923,
upon findings in favor of the defendants, in an action
by a tenant for damages to goods by water, tried to
the court.   Affirmed.

*Maurice D. Leehey* and *Robert M. Jones,* for appel-
lant.

*Preston, Thorgrimson & Turner,* for respondents.

HOLCOMB, J.—Appellant, subtenant of a former
lessee of a former owner of certain premises in Seattle,
sued respondents, subsequent purchasers from the
former owner of the property, for damages alleged to
have been caused by water issuing from unprotected
pipes upon portions of the premises over which re-
spondents had exclusive control and appellant had
none, claiming the total sum of $3,295.26.

Upon issue being joined and the case tried, the court
made findings of fact which explain the nature of the
case as briefly as can be done.   The findings are as
follows:

[1]Reported in 226 Pac. 723.

"I. On July 17, 1919, one George G. Gross was the owner of the building referred to in the complaint. It consisted of a basement, five storerooms fronting on Union Street, numbered from the corner store, which was No. 500 Union Street, easterly to the alley in the block, the other street numbers being 504, 506, 508 and 510, and a hotel on the floors above. On that date the owner leased to Converse Co. Inc., a corporation, the storeroom numbered 510 and all of the basement of the building, except a furnace room situate on the northeast corner of the basement. On April 30, 1921, the Converse Co. Inc., sublet to the plaintiff the northerly portion of such basement, and the possession under said lease and sub-lease continued in the lessee and sub-tenant respectively until after May 22, 1922.

"II. On or about March 1, 1921, said store-room No. 506 was under lease from said Gross for a term then unexpired, and on the date last named the lessee thereof assigned his lease to one Stockhoff, who took possession of the leased premises and remained there in possession until on or about June 30, 1921.

"III. At the time Stockhoff moved in there was no water connection in or to said store-room No. 506. He installed a water supply in said store-room. This supply was by means of two half-inch pipes running between the floor of No. 506 and the ceiling of the basement shortly thereafter occupied by the plaintiff. One of these pipes was connected with the cold water system by tapping the pipe which supplied cold water to a sink or basin theretofore and now located toward the rear or western end of a hall-way which extended along the rear of said store-room No. 504, 506, 508 and 510. The flow of water at the point of connection was controlled by a cut-off then separately installed for that purpose. That hall-way was used in common by the tenants of said store-rooms numbered 506, 508 and 510, and by the basement tenants other than the tenant of the furnace room. Said cold water pipe extended from under said sink down beneath the floor of the hall-way and thence through an opening in the partition and into said space between said floor and

ceiling for a distance of 20 feet or thereabouts. It then had an elbow deflecting it up to and through the floor of No. 506. The hot water pipe paralleled the course of the cold water pipe in said space between ceiling and floor, and turned by an elbow at the same point and passed up through the floor into said store-room. The method of this installation was not known to said Gross or his agents. On or about August 1, 1921, the said Gross leased No. 506 to one O'Brien, who thereupon moved in and remained there until about May 1, 1922. From thence until after May 22, 1922, said store-room No. 506 remained vacant. All of that water connection which extended above the floor was taken out by Stockhoff when he moved out. Shortly after O'Brien moved in all that was visible of the same was the two holes in the floor referred to, and a hole for the waste pipe and each of the two first-named contained a cap such as is used in plumbing for capping a half-inch pipe. In December, 1921, the defendants bought said building from said Gross and conveyance being made accordingly. At that time and thereafter until May 22, 1922, the condition last above described as existing in said room No. 506 continued without change.

"IV. On the night of May 20, and during May 21st and the early hours of May 22, 1922, the stock of wall paper of the plaintiff stored in said portion of basement occupied by the plaintiff became damaged by water escaping on to it from the ceiling above. A plumber employed in the emergency crawled with difficulty into the opening above referred to and, dragging his body along the said two pipes to the end of the same, discovered the cause was that said cold water pipe was open at its extremity. Some person unknown maliciously or otherwise disposed (not the plaintiff nor either of the defendants nor any employee or agent of them or either of them nor the tenant of No. 508) had turned the cutoff under the sink aforesaid so that the water flowed out through that pipe over onto the basement ceiling and through it upon said stock of goods. At that time the caps aforesaid, screwed on to nipples, remained in the floor above, extending down through

the floor, but there was a gap between the top of the elbow and the bottom of the nipple of about one foot. How this condition came about, the evidence does not disclose. A preponderance of the evidence is that it existed from the time Stockhoff moved out.

"V. Neither the said Gross nor the defendants nor the plaintiff nor any agent of either ever knew of the existence of that condition until after it was repaired on the morning of May 22, 1922, and in the exercise of ordinary prudence none of them could have discovered it. The existence and location of the caps in the floor visible from above indicated that the water supply had been properly protected by caps so that water could not escape from the supply pipes and any person viewing the same would have been justified in so concluding. The space between the floor and ceiling above referred to was in total darkness so that the condition at the end of the pipes was only discoverable in the manner in which it was discovered as aforesaid and then only by carrying artificial light into the place. The cut-off under the sink was of the ordinary type, but was not visible to one observing the sink except by the intrusion below the sink of artificial light. Access to said sink was open during business hours. The entrance to said hallway from outside the building was controlled by said Converse Co., and whenever that company closed its establishment said door was locked. It was so locked at about five P. M. of May 20th.

"VI. The water was flowing at eight o'clock on said Saturday night, but the evidence does not show when the flow began, the preponderance being that the flow commenced between five and eight o'clock of that day. During that period of time the access to the sink was possible only to the occupants or visitors to said store-rooms numbered 508 and 510. The fact that water was escaping was not discovered until eight o'clock on said Monday morning."

Upon these findings the court concluded that appellant had no right of recovery.

Appellant excepted to certain findings made by the court and to the refusal of the court to make findings requested by it. The errors claimed are:

1. In finding that the condition of the water connections and the pipe ends in the floor of No. 506 gave no notice of the dangerous defect. °

2. In finding that the defendants and their agents knew nothing of the condition of the pipes until after the accident.

3. In refusing to find it to be the duty of the defendants to have made careful examination of the plumbing and water pipes, especially those indicated by the holes in the floor of No. 506; and in refusing to find that the defendants were guilty of negligence in not so doing.

4. In entering judgment in favor of defendants; and that the findings do not sustain the judgment.

5. In overruling the plaintiff's motion for a new trial.

There is no error in either of the findings first assailed, for the evidence sustains them. In fact, as to the first claim there is no contradiction in the evidence; and as to the second claimed error, the only claim is that of imputed notice to the former owner and his agent, which cannot be imputed to the later one, who had no actual notice.

The principal point of contention is upon the third assignment.

Under this claim appellant contends that the owner of the premises is an insurer of his tenant in one part of the premises for damages flowing from a defect in another part of the premises which other part is under the control of the owner and not under the control of the tenant. Cases from other jurisdictions are cited and it is insisted that the case of *Le Vette v. Hardman*

*Estate,* 77 Wash. 320, 137 Pac. 454, L. R. A. 1917B 222, sustains that contention.

Appellant is in error. By reference to the *Le Vette* case, it will be found that the basis of the complaint was negligence. There was some evidence to show negligence on the part of the landlord, but the trial court dismissed the action by the tenant on granting the nonsuit. This court held that the failure to exercise proper superintendence over the upper story of the building in question might be held to be negligence, and that at least it was a question that should have been submitted to the jury.

That is not the case here. In this case the trial judge heard the witnesses and resolved the evidence against the allegations of negligence upon competent and credible evidence. He also found that respondents had no notice of the defect, and that the defects in the plumbing could not be discovered by ordinary care and prudence. He viewed the premises himself and was able to judge of the conditions accurately.

We have never held that a landlord is an insurer of the premises of the tenant, but in fact have held to the contrary, as in the *LeVette* case, *supra,* that the landlord is bound to ordinary care only, and liable only for negligence for lack of such care. *Bernhard v. Reeves,* 6 Wash. 424, 33 Pac. 873.

And a sub-tenant has no greater rights against the owner than has his immediate landlord, the sub-lessor. *Mesher v. Osborne,* 75 Wash. 439, 134 Pac. 1092, 48 L. R. A. (N. S.) 917; *Hogan v. Metropolitan Building Co.,* 120 Wash. 82, 206 Pac. 959.

The judgment is right and it is affirmed.

Main, C. J., Tolman, Mackintosh, and Parker, JJ., concur.